# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARK MILLS, and
ELLEN MILLS

        Plaintiffs,

        v.

COUNTY OF LAPEER, and
DANA MILLER,

        Defendants.

Case No. 2:09-cv-14026-PDB-MAR
Hon. Paul D. Borman

_____/

## OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION [35], GRANTING PLAINTIFFS' MOTION TO AMEND [19], AND GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [16]

Plaintiffs Mark and Ellen Mills initiated this action against Defendants Lapeer County ("County") and Dana Miller, individually and in her capacity as the County's Treasurer, asserting that Defendants, among other things, violated their due process rights guaranteed by the Fourteenth Amendment, violated Michigan's anti-lockout statute, and unlawfully converted their personal property when County employees removed and destroyed the Mills' belongings stored in County-owned commercial property. On September 13, 2010, Magistrate Judge Randon issued a Report and Recommendation ("Report") (Dkt. 35) granting in part and denying in part Defendants' Motion for Partial Summary Judgment (Dkt. 16), denying Plaintiffs' Motion for Partial Summary Judgment (Dkt. 11), and denying Plaintiffs' First Motion to Amend (Dkt. 19) as moot. Plaintiffs and

Defendants have each filed an Objection to the Report. (Dkts. 40, 41.)[1]  For the reasons set forth below, the Court ADOPTS IN PART and REJECTS IN PART the Magistrate Judge's Report, and, accordingly, GRANTS Plaintiffs' First Motion to Amend (Dkt. 19), and GRANTS summary judgment in favor of Defendants on Counts I, II, IV, V, and VI of the First Amended Complaint (Dkt. 19-1).

## I. BACKGROUND

### A. Facts

Prior to the events giving rise to this case, the Mills were land contract vendees of commercial property located in Lapeer County, Michigan ("Property").  The present conflict originated when neither the Mills, nor the land contract vendor, paid taxes on the Property. (Dkt. 1, Compl. ¶¶ 13-14; Dkt. 15, Defs.' Resp. ¶¶ 1-2.) In accordance with the tax-foreclosures procedures set forth at Mich. Comp. Laws § 211.57 *et seq.*, the County obtained an Order of Foreclosure on February 23, 2009. (Dkt. 15, Defs.' Resp., Ex. 3.)

Defendants did not obtain title to the Property on February 23, 2009, however.  Rather, the Order of Foreclosure, consistent with Michigan's tax-foreclosure statute, provided that title would not pass to the County until April 1, 2009. (Dkt. 15, Defs.' Resp., Ex. 3.) Specifically, it stated, "if the lands are not redeemed by payment of delinquent taxes, interest, penalties and fees . . . on or before April 1, 2009, fee simple title . . . to the lands shall be vested in the Lapeer County Treasurer

---

[1]Defendants did not file a response to Plaintiffs' Objection, and Plaintiffs filed a late Response to Defendants' Objection (Dkt. 43). The Court GRANTS Plaintiffs' Motion to Allow Filing of Plaintiffs' Response to Defendants' Objection (Dkt. 42). Although tardy, the arguments it contains are largely duplicative of Plaintiffs' other briefing and it is therefore not unfairly prejudicial to Defendants for the Court to consider it. Moreover, Defendants had the opportunity to file a Reply but declined.

without a further right of redemption." (*Id.*)

Sometime between May 4 and May 7, 2009, Plaintiff Ellen Mills had one or more discussions with Defendant Miller regarding when the Mills had to vacate the property. (Dkt. 15, Defs.' Resp., Ex. 4.)[2] The parties disagree on what was decided as a result of those conversations. Miller asserts that, on the advice of counsel, she told Ellen Mills that, as of April 1, 2009, they were required to have vacated the Property. (*Id.*) Plaintiffs, on the other hand, assert that "[n]o resolution was reached" as to when the Mills had to leave. (Dkt. 11, Pls.' Mot. ¶ 3; Dkt. 41, Pls.' Obj. at 2.) Plaintiffs do concede, however, that "[t]hey were told that they had to leave." (Dkt. 43, Pls.' Resp. to Defs.' Obj. at 6.)

On May 8, 2009, Miller, acting in her capacity as County Treasurer, issued a Notice to Quit to the Mills. (Dkt. 15, Defs.' Resp., Ex. 5.) The Notice to Quit provided that the Mills "must move by June 9, 2009 or your landlord/landlady may take you to court to evict you. . . .  If your landlord/landlady takes you to court to evict you, you will have the opportunity to present reasons why you believe you should not be evicted." (*Id.*)

As it pertains to Defendants' claim that Plaintiffs had abandoned the Property, Miller avers that on June 6, 2009 (a Saturday) her and her husband were headed "up north" and drove by the Property. She avers that she "observed vehicles, at least one with a trailer attached, and people who

---

[2]Miller's statement, (Dkt. 15, Defs.' Resp., Ex. 4), was originally unsworn. Plaintiffs objected on this basis. In their Reply, Defendants attached an affidavit from Miller swearing to the accuracy of the statement. (Dkt. 18, Defs.' Reply, Ex. 1.) This cured the asserted deficiency. *Cf. Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 634 (S.D. Tex. 2007) ("While filing [an] unsworn expert report did not constitute admissible summary judgment evidence, *see* Fed. R. Civ. P. 56(e), that deficiency was cured by filing the sworn declaration . . . ."); *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1063-65 (N.D. Iowa 2006) ("[S]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment.").

3

were moving items out of the [P]roperty and loading that property into vehicles and trailers." (Dkt. 15, Defs.' Resp., Ex. 4, Miller's Stmt. at 4.) The following Monday she told County legal counsel what she had observed, and based on that conversation she instructed that the locks on the Property be changed—after the June 9, 2009 date in the Notice to Quit. (*Id.*)

On June 11, 2009, County "[b]uilding and grounds staff" went to the Property and changed the locks. (*Id.*) Defendants state that when they arrived on the Property that day, it was unsecured and without electricity:

> The front door to the building was not secured and merely fell over when pushed. A garage style lift door was unlocked and able to be lifted. Sliding doors on the building were unlocked and able to be opened. Windows on the back of the building were missing. Further, there was no electrical service to the building.

(Dkt. 15, Defs.' Resp. ¶ 5.)

Beginning on June 16, 2009,[3] "County employees, 'trustys' from the Lapeer County Jail, private contractors, friends and relatives of County employees and their agents" allegedly entered the Property and removed and destroyed the Mills' personal property. (Dkt. 11, Pls.' Mot. at 5.) Among the belongings allegedly taken from the Mills are a pair of horse carts. (Dkt. 1, Compl. ¶ 22.) In addition, business records, the Mills' children's personal papers, and certain filings related to the Mills' bankruptcy case were allegedly left in the building but allegedly destroyed by the County employees' intrusion. (Compl. ¶ 26.)

Defendants do not dispute that County employees entered the Property and removed the

---

[3]In their Complaint, Plaintiffs alleged that County employees began to remove Property on June 9, 2009. (Compl. ¶ 19.) In the Objections to the Magistrate Judge's Report, however, the parties appear to agree that June 16, 2009 was the date Plaintiffs' property was first removed. (Dkt. 40, Defs.' Obj. at 2; Dkt. 41, Pls.' Obj. at 1.) The Court accepts June 16, 2009, as the correct date.

4

Mills' belongings, but they assert that such conduct was lawful. (Dkt. 15, Defs.' Resp. ¶ 5.)

## B. Procedural History

On March 21, 2010, Plaintiffs moved for summary judgment on the following four claims in the *original* Complaint: due process (Count I), Michigan's anti-lockout statute (Count III), conversion (Count IV), and breach of contract (Count V). (Dkt. 11, Pls.' Mot.) On April 22, 2010, Defendants filed a Response to Plaintiffs' Motion for Partial Summary Judgment (Dkt. 15), and also filed their own Motion for Partial Summary Judgment (Dkt. 16). In their Motion, Defendants seek summary judgment on the same four counts. (Dkt. 16, Defs.' Mot. ¶ 7.)[4]

After Defendants moved for summary judgment, on May 4, 2010, Plaintiffs filed their First Motion to Amend. (Dkt. 19.) That Motion seeks to add a count (Count I) alleging that Defendants have violated the Fourth and Fourteenth Amendments to the U.S. Constitution by unlawfully seizing Plaintiffs' personal property. (Dkt. 19, Ex. 1, First Proposed Am. Compl. ¶¶ 36-39.)

## C. The Magistrate Judge's Report and Recommendation

The Report addresses the parties' first set of cross-motions for partial summary judgment (Dkts. 11, 16) and Plaintiffs' First Motion to Amend (Dkt. 19). (*See generally*, Dkt. 35, Report.)

Regarding the Motion to Amend, the Magistrate Judge concluded that there was no "bad faith [on the part of Plaintiffs], [or] lack of notice or undue prejudice to Defendants." (Dkt. 35, Report

---

[4]Defendants, in their Objection to the Magistrate Judge's Report, assert that Count VI of the original Complaint (fraud/misrepresentation) should be dismissed. (Dkt. 40, Defs.' Obj. at 9.) Defendants did not move for summary judgment on that count, however. (Dkt. 16, Defs.' Mot. at 11 ("Defendants request that this Honorable Court dismiss Plaintiffs' claims in Counts I, III, IV and V for Illegal Eviction, Conversion, Breach of Contract and Deprivation of Property without Due Process of Law").) Further, the Magistrate Judge did not address the fraud/misrepresentation count in his Report. (Dkt. 35, Report at 6 n.2.) Finally, the fraud/misrepresentation count is addressed fully in Defendants' Second Motion for Summary Judgment. (Dkt. 34, Defs.' Second Mot. Summ. J. at 13.) Accordingly, the Court will not address this count further in this Opinion.

5

at 5.) Although concluding that the Fed. R. Civ. P. 15(a)(2) standard for leave was satisfied, the Magistrate Judge denied the Motion to Amend as moot in light of Plaintiffs' Second Motion to Amend. (*Id.* at 5, 18.) The Magistrate Judge nevertheless "consider[ed] the cross motions for summary judgment in relation to Plaintiffs' claims as presented in the first Proposed Amended Complaint (Dkt. 19, Ex. 1)." (*Id.* at 5.) Thus, it appears that, for all intents and purposes, the First Motion to Amend was not denied as moot, but instead granted.

As for the cross-motions for summary judgment, the Magistrate Judge's findings are discussed in detail below. Briefly, the Magistrate Judge recommended that summary judgment in favor of Defendants should be granted on Plaintiffs' conversion and breach of contract claims. (Dkt. 35, Report at 6.) He also concluded that Defendants' Motion should be denied as to Plaintiffs' anti-lockout claim because Plaintiffs were, as a matter of law, tenants at sufferance. (*Id.* at 9-12.) As for the two claims arising under the Federal Constitution, the Magistrate Judge also recommended denial of Defendants' Motion. He found that Defendants were not entitled to qualified immunity because the law was clear that self-help evictions violated both procedural due process and Plaintiffs' right to be free from illegal seizures. (*Id.* at 15-16.) Finally, the Magistrate Judge found that there was a genuine issue of material fact as to whether Defendants had a good faith belief that the Property was abandoned. (*Id.* at 12.) Based on this conclusion, Plaintiffs were not entitled to summary judgment on either of their constitutional claims or their state-law anti-lockout claim. (*Id.*)

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment

When a court considers cross motions for summary judgment, it "must evaluate each motion on its own merits." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

6

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. In particular,

> The respondent must do more than simply show that there is some metaphysical doubt as to the material facts. Further, where the record taken as a whole could not lead a rational trier of fact to find for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087-88 (6th Cir. 1996) (internal alterations and citations omitted).

Ultimately, the Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

7

**B. Review of a Magistrate Judge's Report or Order**

The Federal Magistrate's Act "creates two different standards of review for district courts when a magistrate court's finding is challenged in district court. A district court shall apply a 'clearly erroneous or contrary to law' standard of review for the 'nondispositive' preliminary measures of [28 U.S.C.] § 636(b)(1)(A). Conversely, 'dispositive motions' excepted from § 636(b)(1)(A), such as motions for summary judgment[,] . . . are governed by the de novo standard." *U.S. v. Curtis*, 237 F.3d 598, 602 (6th Cir. 2001); *see also* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

A motion to amend is a non-dispositive motion, and therefore the "clearly erroneous" and "contrary to law" standards govern the Court's review of the Magistrate Judge's denial of Plaintiffs' First Motion to Amend. *E.g.*, *Rice v. Askins*, No. 09-2021, 2009 WL 2163508, at *2 (W.D. Tenn. July 13, 2009); *Lyle v. Olney*, No. 2005 WL 2319008, 2005 WL 2319008, at *1 (E.D. Mich. Sep. 21, 2005). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *Hagaman v. Comm'r of Internal Revenue*, 958 F.2d 684, 690 (6th Cir. 1992) (internal quotations omitted); *see also United States v. Mandycz*, 200 F.R.D. 353, 356 (E.D. Mich. 2001).

In contrast, the filing of timely objections to a magistrate judge's grant or denial of a motion for summary judgment requires the district court to "make a *de novo* determination of those portions of the report or specified findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In completing its *de novo* review, this Court re-examines all the relevant evidence previously reviewed by the magistrate judge to determine whether the recommendation should be accepted, rejected, or modified in whole or in part. 28 U.S.C. § 636(b)(1). The Court, however, "is

8

not required to articulate all of the reasons it rejects a party's objections." *Thomas v. Halter*, 131 F. Supp. 2d 942, 944 (E.D. Mich. 2001) (citations omitted); *see also Tuggle v. Seabold*, 806 F.2d 87, 92 (6th Cir. 1986). Further, "section 636(b)(1) does not on its face require any review at all, by either the district court or the court of appeals, of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985).

## III. ANALYSIS

### A. The Court Grants Plaintiffs' First Motion to Amend

As an initial matter, the Court grants Plaintiffs' First Motion to Amend. (Dkt. 19.) Although the Magistrate Judge denied the motion as moot in light of Plaintiffs' Second Motion to Amend (Dkt. 34), he concluded that, consistent with the Rule 15(a)(2) standards for granting leave, there was no "bad faith [on the part of Plaintiffs], [or] lack of notice or undue prejudice to Defendants." (Dkt. 35, Report at 5.) Further, the Magistrate Judge addressed the merits of the Fourth Amendment claim, finding that "Defendants are not entitled to qualified immunity." (*Id.* at 16.) Because (1) the Fourth Amendment claim has been fully briefed, (2) Defendants have not demonstrated prejudice, and (3) the Magistrate Judge has already addressed the claim, the Court GRANTS Plaintiffs' First Motion to Amend. Accordingly, for the remainder of this Opinion, the Court will refer to the counts as numbered in the First Amended Complaint (Dkt. 19-1).

### B. Count IV of the First Amended Complaint, Plaintiffs' Claim That Defendants Violated Michigan's Anti-Lockout Statute, Fails as a Matter of Law

As it pertains to Count IV of the First Amended Complaint, the Magistrate Judge, relying primarily on *Barron v. Federal Home Loan Mortg. Corp.*, No. 07-11580, 2008 WL 275675 (E.D. Mich. Jan. 31, 2008), held that because Plaintiffs were, as a matter of law, tenants at sufferance, they

were "tenant[s]" within the meaning of Michigan's anti-lockout statute, Mich. Comp. Laws § 600.2918(2). In addition, the Magistrate Judge noted that even if Plaintiffs were trespassers, "Defendants had to secure a court order before evicting Plaintiffs from the Property." (*See* Dkt. 35, Report at 9 (citing *De Bruyn Produce Co. v. Romero*, 508 N.W.2d 150 (Mich. Ct. App. 1993)).)[5]

Both parties argue that the Magistrate Judge erred by not granting summary judgment in their favor on Count IV of the First Amended Complaint. Defendants object to the Magistrate Judge's conclusion that Plaintiffs were "tenant[s]" as that term is used in Mich. Comp. Laws § 600.2918(2). (Dkt. 40, Defs.' Obj. at 4-6.) Plaintiffs respond by urging the Court to adopt the Magistrate Judge's finding that they were tenants at sufferance. In addition, Plaintiffs have their own objection to the Magistrate Judge's Count IV recommendation: they assert that there is no genuine issue of material fact as to whether Defendants had a "good faith" belief or performed a "diligent inquiry" within the meaning of the anti-lockout statute's abandonment safe-harbor.

For the following reasons, the Court agrees with Defendants that the Mills were not any of the common-law types of tenants: tenants by the years, at will, or at sufferance. Accordingly, Plaintiffs' are not tenants under Mich. Comp. Laws § 600.2918(2) and their anti-lockout claim fails as a matter of law. It follows that the Court need not address Plaintiffs' objection regarding abandonment.

---

[5]The Magistrate Judge also found that Mich. Comp. Laws § 600.2918(1) was inapplicable because the evidence did not suggest that Defendants "used force or threat of force to physically remove Plaintiffs from the Property or to bar Plaintiffs' reentry to the Property." (Dkt. 35, Report at 7.) Neither party has objected to this finding, and, moreover, the Court agrees with the Magistrate Judge's conclusion as to subsection (1).

10

*1. No Landlord-Tenant Relationship Existed Between Plaintiffs and Defendants*

Subsection (2) of Michigan's anti-lockout statute prohibits an owner's interference with a tenant's possession:

> Any *tenant* in possession of premises whose possessory interest has been unlawfully interfered with by the owner, lessor, licensor, or their agents shall be entitled to recover the amount of his actual damages or $200.00, whichever is greater, for each occurrence and, where possession has been lost, to recover possession.   Unlawful interference with a possessory interest shall include . . . (b) [t]he removal, retention, or destruction of personal property of the possessor.

Mich. Comp. Laws § 600.2918(2) (emphasis added).  The term "tenant," however, is not defined in the statute.

Following *Barron*, the Magistrate Judge concluded that "tenant," within the meaning of the anti-lockout statute, includes "tenants at will, by the years, or by sufferance." *See Barron*, 2008 WL 275675, at *1 ("The Michigan antilockout statute, MCL 600.2918, draws no distinction among tenants at will, by the years, or by sufferance. Therefore, this Court finds that the term 'tenant', as it is used in MCL 600.2918(2), is intended to include all three types of tenancies.").  Although Defendants urge the Court to adopt a narrower definition of "tenant," even granting Plaintiffs this broader definition, no landlord-tenant relationship existed between the parties.[6]

While they make the argument in passing, Plaintiffs do not strongly contend that they had a tenancy by the years with Defendants.  In *Grant*, the Michigan Supreme Court noted that such a relationship exists where there is:

---

[6]Defendants urge the Court to adopt the definition set forth in *Nelson v. Grays*, 531 N.W.2d 826 (Mich. Ct. App. 1995): that a "tenant" is limited to those obligated to pay rent. *Nelson* is discussed in detail below.

11

> "permission or consent on the part of the landlord to occupancy by
> the tenant, subordination of the landlord's title and rights on the part
> of the tenant, a reversion in the landlord, the creation of an estate in
> the tenant, the transfer of possession and control of the premises to
> him, and, generally speaking, a contract, either express or implied,
> between the parties."

*Grant v. Detroit Ass'n of Women's Clubs*, 505 N.W.2d 254, 258 n.6 (Mich. 1993) (quoting 51C CJS,

Landlord and Tenant, § 1, p. 32); *see also Cecil v. Viacom Outdoor Group, Inc.*, No. 05-71805, 2005

WL 2177096, at *4 (E.D. Mich. Sept. 8, 2005) (explaining that a tenancy by the years "is a tenancy

which has a fixed, ascertainable term . . . which may not be unilaterally shortened by either party,"

and is "based upon an agreement between the parties . . . that the relationship between them is to be

that of landlord and tenant."). Plaintiffs assert that by sending a Notice to Quit, the County "created

a landlord-tenant relationship with Plaintiffs." (Dkt. 11, Pls.' Mot. at 7.) Plaintiffs have cited no

legal authority in support of this contention. Moreover, the Notice to Quit states that "Lapeer

County[] is terminating your tenancy and *wants to evict you*," and "[t]he County of Lapeer is now

the owner of said property and *does not wish to lease this property*." (Dkt. 15, Defs.' Resp., Ex. 5

(emphases added).) In light of these statements, it unreasonable to conclude that by sending the

Notice to Quit the County intended to enter into any type of "agreement" with Defendants. Indeed,

the Magistrate Judge found that the Notice to Quit created no "contractual relationship or 'lease'"

between the parties, (Dkt. 35, Report at 18), and neither side has objected to this conclusion.

Accordingly, the Court holds that no tenancy by the years existed in this case.

For similar reasons, the Mills were not tenants at will. As with a tenancy by the years, a

tenancy at will requires consent on the part of the property owner. *Gault v. Stormont*, 17 N.W. 214,

215 (Mich. 1883) ("There is no ground for contending that defendant was a tenant at will, and

12

entitled to notice to quit before being proceeded against. A tenancy at will is only established by the actual or presumed consent of the owner."); *Cecil*, 2005 WL 2177096, at *4 ("[B]oth a tenancy at will and an estate for years share the common characteristic of being based upon an agreement between the parties, either express or implied, that the relationship between them is to be that of landlord and tenant."). Although the parties dispute exactly what Miller told Ellen Mills between May 4 and May 7, 2009, Plaintiffs concede that "[t]hey were told that they had to leave." (Dkt. 43, Pls.' Resp. to Defs.' Obj. at 6.) Moreover, beyond that early-May 2009 conversation and the Notice to Quit, the record reflects no other communications between the County and the Mills prior to property removal. Thus, the record does not support the conclusion that the County impliedly consented to the Mills' continued presence on the Property, and, accordingly, the Mills were not tenants at will.[7]

Nor are Plaintiffs properly considered tenants at sufferance. It is true, as Plaintiffs have stated, that "[a]s a general rule, when a tenant comes rightfully into possession of land by permission of the owner and continues to occupy the same after the time for which, by such permission, he had the right to hold the same, he becomes a tenant by sufferance." *Felt v. Methodist Educational Advance*, 232 N.W. 178, 180 (Mich. 1930); *accord Ryal's, Inc. v. Stavropoulos*, 263 N.W. 770, 770 (Mich. 1935) (stating that a tenant at sufferance is one "who came into possession rightfully, by permission of the owner, and continued to occupy the premises after the expiration of his lease."). Indeed, *Barron*, relied upon by the Magistrate Judge in finding that Plaintiffs were tenants at

---

[7]Even if one were to infer that the County impliedly consented to the Mills' presence by giving the Mills the 30 days referenced in the Notice to Quit, it is a strained inference to conclude that any such consent extended beyond that time frame. And, it is undisputed that the locks were not changed, and property was not removed, until after this 30-day period.

sufferance, stated the rule as such. 2008 WL 275675 at *1.

This general rule, as it focuses solely on the acts of the putative tenant at sufferance, appears to be an incomplete statement of the law, however. Rather, under Michigan law, while there need not be consent on the part of the owner to create a tenancy at sufferance, the owner must still tacitly accept or passively acquiesce to possession of the property by the tenant. *U.S. v. Hunyady*, 409 F.3d 297, 301 (6th Cir. 2005) ("[A]t common law, the defining element of a tenancy by sufferance is the *passive acquiescence* by the property owner. In a tenancy by sufferance, in other words, the landlord 'suffers' the tenant's presence. Michigan caselaw on this point, though limited, is clear." (emphasis added).) This "passive acquiescence" may be inferred when the owner has delayed in objecting to the tenant's presence. *School Dist. No. 11 of Alpine Twp. v. Batsche*, 64 N.W. 196, 197 (Mich. 1895) ("We think the rule is that a person in possession of land lawfully, who holds over without right, becomes a tenant at sufferance, *if the owner suffers him to remain in possession a sufficient length of time to imply an intentional acquiescence in the occupancy*, and it is not necessary that the previous holding be that of a tenant." (emphasis added)); *see also Allen v. Carpenter*, 15 Mich. 25, 1866 WL 1396, at *6 (Mich. 1866) ("I think I am safe in saying, under the decisions and on general principles, that whenever the occupant continues to hold by the consent of the owner, he becomes entitled to notice as tenant at will; and that *where the owner suffers him to remain in possession without objection*, and to make such use of the premises as would render it unjust to demand and enforce possession against him without warning, this *laches of the owner* entitles him to the statutory notice as tenant at sufferance." (emphases added)); *De Bruyn Produce Co. v. Romero*, 508 N.W.2d 150, 158 (Mich. Ct. App. 1993) (finding that defendants were not tenants at sufferance absent plaintiff's laches, reciting rule that "[a]n employee who continues to occupy housing provided by

14

an employer after the termination of the employment relationship may be considered to be a tenant by sufferance if the employer allows him to remain in possession for a sufficient period to imply acquiescence in the occupancy."). Indeed, Plaintiffs rely on *Felt* for their definition of tenant at sufferance (Dkt. 11, Pls.' Mot. at 8.), but in that case the Michigan Supreme Court stated, "[t]he corporation continued in possession thereafter for approximately *two years without objection* from the remaindermen. It thus became a tenant at sufferance, and was entitled to the statutory notice." 232 N.W. at 180 (emphasis added). Given the forgoing authority, not every hold-over tenant once lawfully in possession is per se a tenant at sufferance. Rather, there must also be sufficient delay or other facts supporting an inference of "passive acquiescence" on the part of the property owner. *See Hunyady*, 409 F.3d at 301-302.

The Court finds the Sixth Circuit's decision in *Hunyady* to be instructive on whether Plaintiffs were tenants at sufferance or trespassers. There, the criminal defendant, Hunyady, had been a resident at his father's house prior to his father's death. 409 F.3d at 299. After his father died, the house was entrusted to one Visser with no provision made for Hunyady. *Id.* About two weeks after being entrusted with the residence, Visser told Hunyady that he "would have to move out," and on that same day (or the next) Visser changed the locks on the house. *Id.* Nevertheless, Hunyady continued to live in the house, entering through a basement window. *Id.* Approximately a month after changing the locks, Visser, on one of his visits to the house, provided Hunyady with a formal notice to quit. *Id.* On that visit, he also noticed that Hunyady had been keeping machine guns in the house. *Id.* Visser immediately contacted U.S. agents and, a day later, the agents appeared at the house and seized the assault rifles. *Id.* at 300.

Hunyady appealed the district court's denial of his motion to suppress, arguing that he had

15

a reasonable expectation of privacy in his father's former house. The Court of Appeals disagreed.
Applying the tenant at sufferance standard recited above, the Sixth Circuit reasoned that because
(1) "Hunyady had been living at the residence without Visser's permission for only a few weeks,"
and (2) Visser had told Hunyady that he had to leave the premises and then changed the locks,
"Visser had not acquiesced to Hunyady's presence on the property." *Id.* at 302. Accordingly, the
Court of Appeals held that "Hunyady's argument that he was a tenant by sufferance under Michigan
law is unpersuasive. We believe that Hunyady was instead a trespasser under Michigan law at the
time of the search in question." *Id.*

There are a number of strong parallels between *Hunyady* and this case. First, like Hunyady,
the Mills had only kept their belongings at the Property for "a few weeks" after Lapeer County had
come into ownership of the Property. Although Plaintiffs assert that title passed to the County on
February 23, 2009, this is belied by the record and Michigan law. On February 23, 2009, the County
received an *Order of Foreclosure*; this, in turn, provided that, failing redemption, title would pass
to the County on April 1, 2009. Thus, the time between when the County first had legal title to the
Property and when Miller told Ellen Mills that they had to leave (around May 7, 2009) was just over
a month. This is comparable to the two-week period between Visser's entrustment and when
Hunyady was told that he had to leave. In addition, the total time between Visser's entrustment and
the gun seizure was about two-and-half months; this is almost identical to the time between the
County's grant of title to the Property (April 1, 2009) and the removal of Plaintiffs' property (June
16, 2009). Finally, like Hunyady, the Mills were told that they had to leave—even though, accepting
Plaintiffs' version of the facts, Miller did not provide an exact date to Ellen Mills. Given the
similarities between this case and *Hunyady*—including the short period of time that the Mills

16

possessed the Property without the County's permission and the County's instruction for the Mills to leave—the County's tacit acceptance of the Mills' presence cannot be reasonably inferred. Accordingly, the Mills were trespassers under Michigan law.

The Notice to Quit does not alter this conclusion. As an initial matter, it does not appear that serving the Notice to Quit constitutes a binding admission that the County believed the Mills were tenants. *See Ann Arbor Tenants Union v. Ann Arbor YMCA*, 581 N.W.2d 794, 798 (Mich. Ct. App. 1998) ("Although the 1995 agreement between the city and the YMCA makes reference to the operation of a 'residence program' and the provision of 'housing,' this does not operate as an admission that the YMCA is providing 'rental housing' that gives rise to a landlord-tenant relationship. To be binding on the YMCA, such a statement must be made by a party or the party's attorney during the course of a trial and must be a distinct, formal admission solemnly made for the express purpose of dispensing with proof of a particular fact."). Second, even assuming the Notice to Quit was an admission, whether the Mills were "tenant[s]" is a legal question and a contrary admission plays little role in a court's answer to such a question. *Id.* ("[A]n admission regarding a point of law is not binding on a court."). If, as a counter-factual, soon after title had transferred to the County, they were informed of the Mills' continued presence on the Property, and, despite this knowledge, Miller and the County did nothing for a year, an admission by the Mills that they were trespassers would do little to rebut the inference that the County had tacitly acquiesced to the Mills' prolonged use, and thus, the Mills were tenants at sufferance. Third, the present factual situation is again similar to *Hunyady*. There, Visser had also provided Hunyady a notice to quit. But "the notice to quit notwithstanding," the Court of Appeals held that Hunyady was a trespasser under Michigan law. 409 F.3d 297, 302 (6th Cir. 2005); *see also U.S. v. Hunyady*, 284 F. Supp. 2d 755, 759 (E.D.

17

Mich. 2003) (reasoning that a notice to quit does not "legitimatize the wrongfulness of the possession.").

Because the evidence, construed in the light most favorable to Plaintiffs, does not suggest that the Mills were tenants, the Court holds that, as a matter of law, the Mills were trespassers.

### 2. The Term "Tenant" in Mich. Comp. Laws § 600.2918(2) Does Not Include Trespassers

Plaintiffs assert that even if they were trespassers, Mich. Comp. Laws § 600.2918(2), which provides a cause of action for a "tenant in possession," nonetheless prohibited Defendants from engaging in a self-help eviction. (Dkt.11, Pls.' Mot. Summ. J. at 9.) After a review of the applicable case law, the Court declines Plaintiffs' invitation to adopt a reading of subsection (2) directly contrary to its plain language.

In *Nelson v. Grays*, the Michigan Court of Appeals defined "tenant" within the meaning of Mich. Comp. Laws § 600.2918(2) to be "the person or persons actually obligated to pay rent." 531 N.W.2d 826, 828 (Mich. Ct. App. 1995). The plaintiffs in *Nelson*, a mother and her two minor children, rented a mobile home under a lease with the defendant. *Id.* at 827. When the defendant subsequently failed to pay the electric bill causing electric service to be shut off in the home, the family moved out and filed suit pursuant to Mich. Comp. Laws § 600.2918(2).[8] *Id.* The lower court awarded damages to the mother, but denied an award to her two children because there were not "tenants" under the statute. *Id.* at 829. In affirming, the Michigan Court of Appeals construed "tenant" in accordance with its "common and approved" usage. *Id.* at 828. After consulting a number of dictionaries and Michigan's Landlord Tenant Relationship Act, the court limited the term

---

[8]Subsection (2)(f) provides that an unlawful interference with a tenant's possession includes that termination of electric service. Mich. Comp. Laws § 600.2918(2)(f).

"tenant" to one who "pays consideration in exchange for the right to occupy the property." *Id.* at 828-29. Because the children had no "separate contractual right to occupy the premises," they were not "tenant[s]" under subsection (2). *Id.* at 829.

While this Court acknowledges that *Nelson* did not explicitly hold that the term "tenant" excludes trespassers, that conclusion naturally follows from that court's definition and reasoning. Under *Nelson* it is plain that "tenant" cannot be read out of the anti-lockout statute. It is equally clear that the term cannot be read to include all persons—in *Nelson* the court even excluded *lawful* occupants of the property. *See also Ann Arbor Tenants Union v. Ann Arbor YMCA*, 581 N.W.2d 794 (Mich. Ct. App. 1998) (distinguishing between "tenants" within the meaning of Mich. Comp. Laws § 600.2918 and "guests" under Michigan law governing hotels, and concluding that residents staying at the YMCA could not be considered "tenants" under § 600.2918 because they were not granted exclusive use and possession of their rooms).

The Magistrate Judge cited *De Bruyn Produce Co. v. Romero*, 508 N.W.2d 150, 157 (Mich. Ct. App. 1993) in support of the proposition that self-help is prohibited under Michigan Law even if Plaintiffs were trespassers. (Dkt. 35, Report at 9.) *De Bruyn*, in turn, relied upon *Deroshia v. Union Terminal Piers*, 391 N.W.2d 458 (Mich. Ct. App. 1986).

In *Deroshia*, the plaintiff had leased a commercial property from the defendant. 391 N.W.2d at 459. About three months before the lease was set to expire, the landlord "sent plaintiff a letter informing him that the lease would not be renewed." *Id.* Despite the defendant's letter and the expiration of the lease, the plaintiff remained on the property. *Id.* Six days after the lease expired, defendant's "president and several others entered the premises while the business was closed and replaced the locks on the building." *Id.* The lower court "concluded that the antilockout law . . . did

19

not abrogate a landlord's common-law self-help remedy to recover possession of property from a holdover tenant." *Id.* The Michigan Court of Appeals reversed and instead held "that subsection (2) of the antilockout statute prohibits a landlord from resorting to self-help even where the landlord is entitled to possession. Instead the landlord must, on refusal of the tenant to surrender the leased premises, resort to judicial process." *Id.* at 460.

The Court finds *Deroshia* unpersuasive given the facts of this case. As an initial matter, the *Deroshia* court never explicitly defined or construed the term "tenant," and it made no explicit finding as to whether the plaintiff was a tenant at will, at sufferance, or a trespasser. Instead it repeatedly referred to the plaintiff as a "holdover tenant," which suggests that it believed that the plaintiff was a tenant at sufferance. *Id.* at 459, 461. Second, the court ignored the fact that subsection (1) of the anti-lockout statute explicitly uses the term "person," whereas subsection (2) of the same statute explicitly uses the narrower word "tenant." Third, unlike the court in *Nelson*, the *Deroshia* court did not give the word "tenant" its plain meaning or common and approved usage—rather, it gave substantial weight to the fact that the overarching purpose behind subsection (2) was to "add a subsection eliminating self-help altogether even where not forceful except in certain narrowly defined circumstances not relevant to this case." *Id.* at 460. The Michigan Supreme Court, however, has counseled that statutorily undefined terms such as "tenant" are to be given their plain meaning:

> The primary goal of statutory construction is to give effect to the Legislature's intent. This Court begins by reviewing the language of the statute, and, *if the language is clear and unambiguous, it is presumed that the Legislature intended the meaning expressed in the statute*. Judicial construction of an unambiguous statute is neither required *nor permitted*. When reviewing a statute, all non-technical "words and phrases shall be construed and understood according to

20

> the *common and approved usage* of the language," and, if a term is
> not defined in the statute, a court may consult a dictionary to aid it in
> this goal. A court should consider the *plain meaning of a statute's
> words* and their "'placement and purpose in the statutory scheme.'"

*McCormick v. Carrier*, 487 Mich. 180, 192-93 (2010) (emphases added, internal citations omitted).

In short, to adopt Plaintiffs' reading of subsection (2) of the anti-lockout statute would essentially render the Michigan Legislature's use of the word "tenant" superfluous. This is rarely, if ever, a correct reading of a statute. *Robinson v. City of Lansing*, 782 N.W.2d 171, 183 (Mich. 2010) ("[I]t is well established that in interpreting a statute, we must avoid a construction that would render part of the statute surplusage or nugatory." (internal quotation marks and alterations omitted)). Further, the term "tenant" should be, *McCormick*, 487 Mich. at 192-93, and has been, *Nelson*, 531 N.W.2d at 828-29, accorded its "common and approved" usage, which necessarily excludes trespassers. Accordingly, the Court holds that Defendants did not violate Mich. Comp. Laws § 600.2918 and GRANTS Defendants' Motion for Summary Judgment on Count IV of the First Amended Complaint.

### C. Count II of the First Amended Complaint, Plaintiffs' Due Process of Law Claim, Fails as a Matter of Law

Although not explicit in the Magistrate Judge's Report, he apparently concluded that because Plaintiffs were tenants at sufferance, Plaintiffs had a property interest protected by the Due Process Clause of the Fourteenth Amendment.[9] Further, relying on *Flatford v. City of Monroe*, 17 F.3d 162

---

[9] Count II of the First Amended Complaint actually asserts that Defendants have violated the Fifth Amendment Due Process Clause as incorporated against the states by the Fourteenth Amendment: "The 5th Amendment to the U.S. Constitution, made binding on the states by the Fourteenth Amendment, requires that the states not deprive any citizen of his right to own, posses, use and enjoy personal and private property without due process of law." (Dkt. 1, Compl. ¶ 37.) This is perplexing—the Fourteenth Amendment contains its own Due Process Clause which is applicable here. Further, the quoted language makes clear that Plaintiffs are not alleging a Fifth

(6th Cir. 1994), the Magistrate Judge concluded that it was clearly established at the time of eviction that procedural due process requires pre-eviction judicial process. Accordingly, he found that Defendants were not entitled to qualified immunity.

Defendants object to this aspect of the Report on two grounds. First, they argue that Plaintiffs were granted all process that was due because it is undisputed that Defendants properly foreclosed under Michigan's Tax Foreclosure Act. (Dkt. 40, Defs.' Obj. at 8.) Next, they argue that even if Plaintiffs were denied due process, Defendants are entitled to qualified immunity because the removal of Plaintiffs' belongings was "random and unauthorized" as set forth in *Parratt v. Taylor*, 451 U.S. 527 (1981) and its progeny. (*Id.*)

For the following reasons, the Court finds that because Plaintiffs had no cognizable property interest in the Property at the time of their eviction, Defendants did not violate the Due Process Clause of the Fourteenth Amendment.

### 1. Plaintiffs Had No Protected Property Right at the Time of Eviction

The Due Process Clause of the Fourteenth Amendment provides, "No State shall deprive . . . any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. Procedural Due Process claims are examined in two distinct stages. *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002) (citing, *inter alia*, *Bd. of Regents v. Roth*, 408 U.S. 564, 570-71 (1972); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment. Only after identifying such a right [does a court] continue to consider whether the deprivation of that interest contravened notions of due process." *Id.*

_____

Amendment takings claim.

22

Although the Due Process Clause provides procedural safeguards where there is a protected property right, the Constitution does not create such property interests. *Id.* (citing *Cleveland v. Bd. of Educ. of Loudermill*, 470 U.S. 532, 538 (1985)). "Instead, they are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" *Id.* (quoting *Roth*, 408 U.S. at 577). Thus, to succeed on their Fourteenth Amendment claim, Plaintiffs must have a property interest under Michigan law.

While not binding authority, the Court finds *De Villar v. City of New York*, 628 F. Supp. 80 (S.D.N.Y. 1986) (Leval, J.) instructive on the issue of whether Plaintiffs had a property interest for which a pre-eviction hearing was due. There, title in an apartment building vested in the City of New York through an "*in rem* tax foreclosure." *Id.* at 82. After two attempts by a New York City Department of Housing Preservation and Development ("HPD") employee to persuade the trespassers, squatters, and other illegal residents to leave, the HPD posted a vacate order requiring the occupants to leave within 30 days. *Id.* Without waiting the 30 days, however, HPD officials and New York City police officers ordered the residents to vacate or face arrest. *Id.* at 82. All the occupants, save one, abandoned their apartments—the dissenter was arrested. *Id.* As a result of their eviction, several occupants brought a Fourteenth Amendment Due Process claim against the HPD officials. *Id.*

The *De Villar* court granted summary judgment in favor of the HPD defendants. As relevant here, the court explained:

> Plaintiffs were trespassers, squatters and illegal occupants of the building. *They had no constitutional property interest in the apartments they occupied.* There was no legal bar to arresting them for criminal trespass if the City officials had decided to make a criminal complaint. *Nor do trespassers/squatters possess a*

23

> constitutional entitlement to notice and court proceedings before
> being arrested (or evicted). They have shown no deprivation of
> "rights, privileges or immunities secured by the Constitution or laws
> of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct.
> 1908, 1912, 68 L.Ed.2d 420 (1981).

*Id.* at 83 (emphases added). Moreover, it made no difference to the court that two of the plaintiffs

at one time lawfully possessed their apartments under an employment agreement. The court

concluded that because employment had terminated several months prior to the alleged unlawful

eviction, "the plaintiffs had no property interest in the apartments they were living in, [and] their

evictions did not implicate the Due Process Clause of the Fourteenth Amendment." *Id.*

In this case, as discussed at length, by the time Defendants changed the locks on the Property

and removed Plaintiffs' belongings, Plaintiffs were trespassers under Michigan law. Because

Plaintiffs held no property interest in the building under state law, the Due Process Clause demands

no pre-eviction hearing. That Michigan law allows property owners to use summary proceedings

to evict trespassers, Mich. Comp. Laws § 600.5714(1)(e), does not change the result. This provision

does not create a substantive property interest in favor of Plaintiffs; rather it is a state procedural

safeguard granted to those *lacking* such an interest. *See West Farms Assocs. v. State Traffic

Comm'n*, 951 F.2d 469, 472 (2d Cir. 1991) ("[T]he Due Process Clause does not protect against the

deprivation of state procedural rights"), *cert. denied*, 112 S.Ct. 1671 (1992); *Shango v. Jurich*, 681

F.2d 1091, 1101 (7th Cir. 1982) ("Constitutionalizing every state procedural right would stand any

due process analysis on its head. Instead of identifying the substantive interest at stake and then

ascertaining what process is due to the individual before he can be deprived of that interest, the

process is viewed as a substantive end in itself."); *cf. Olim v. Wakinekona*, 461 U.S. 238, 250 n. 12

(1983) (noting that "an expectation of receiving process is not, without more, a liberty interest

24

protected by the Due Process Clause.").

Plaintiffs assert that *Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994) and *Thomas v. Cohen*, 304 F.3d 563 (6th Cir. 2002) demand a different result. This is not so. The plaintiffs in those cases were not trespassers or otherwise illegally occupying the residences at issue. In *Flatford*, city police officers and the Director of Building and Safety ordered the plaintiffs to vacate their apartment because of perceived hazardous conditions (exposed wiring and wood rot)—not because the plaintiffs lacked a lawful property interest in their apartment. 17 F.3d at 165. In *Thomas*, the defendants conceded that the plaintiffs, residents of a transitional shelter, were tenants under Kentucky law. 304 F.3d at 581 n.12; *see also id.* at 576 ("Under Kentucky law, tenants holding leasehold estates have a recognized property interest. Thus, Plaintiffs have a recognized property interest for Fourteenth Amendment purposes." (internal citation omitted)). Accordingly, while *Flatford* and *Thomas* certainly support the proposition that it is a denial of due process to summarily evict an occupant with a property right under state law, they are silent on the issue of whether the Due Process Clause demands pre-eviction judicial process for an occupant with no such interest.

Because Plaintiffs lack a cognizable property right in the building at issue, no process was due under the Fourteenth Amendment. Accordingly, the Court GRANTS summary judgment in favor of Defendants on Count II of the First Amended Complaint.

25

### 2. Even if Plaintiffs had a Protected Property Right at the Time of Eviction, Defendant Miller is Entitled to Qualified Immunity[10]

Qualified immunity shields government officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This protection applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, __ U.S. __, 129 S.Ct. 808, 815 (2009) (internal quotation marks and citation omitted).

In determining whether a right is clearly established, the dispositive inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Thacker v. City of Columbus*, 328 F.3d 244, 260 (6th Cir. 2003) ("Qualified immunity will protect all but 'the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))). This Court "look[s] first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit Court of Appeals] and other courts within our circuit, and finally to decisions of other circuits" when deciding

---

[10]The parties have not distinguished among the Defendants in regards to qualified immunity. To the extent that the constitutional claims are against Defendant Miller in her individual capacity, qualified immunity shields her from suit. On the other hand, the County is not entitled to qualified immunity under section 1983. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) ("Counties and other local governments—while 'persons' for the purposes of § 1983 liability in the sense that they can be sued—do not enjoy the defenses of absolute and qualified immunity that are available to human defendants sued in their individual capacities."). But to succeed against the County, Plaintiffs must demonstrate a policy or custom of violating Constitutional rights. *Id.* ("[T]he liability of counties and other local governments under § 1983 depends solely on whether the plaintiff's constitutional rights have been violated as a result of a 'policy' or 'custom' attributable to the county or local government."). Neither the original Complaint nor the First Amended Complaint makes any such an allegation.

whether the law is clearly established. *Key v. Grayson*, 179 F.3d 996, 999-1000 (6th Cir. 1999).

In this case, it would not have been clear, under the circumstances before Miller, that Plaintiffs had a lawful interest in the Property when their belongings were removed. It is undisputed that Defendants followed the proper procedures under Michigan's Tax Foreclosure Act. This resulted in a valid Order of Foreclosure which provided, consistent with the Act, that the County Treasurer would obtain fee simple title in the Property on April 1, 2009. After ownership changed, Plaintiffs did not attempt to enter into a lease with the County for their continued presence. Miller then had a phone conversation with Ellen Mills in May 2009, where, even assuming Plaintiffs' version of the facts, the Mills were told to leave (at some point). This was followed by a Notice to Quit, which warned that Plaintiffs had until June 9, 2009, to leave the Property. Miller—waiting until after June 9—then directed County employees to change the locks on the building and remove Plaintiffs' belongings. By this time, Miller had the following facts before her: (1) the County owned the Property outright, (2) the Mills had been told to leave, and (3) the 30 day period in the Notice to Quit had passed. Accordingly, it would not have been clear to someone in Miller's position that Plaintiffs had a property interest in the building that required a pre-eviction hearing under the Due Process Clause. *See Saucier*, 533 U.S. at 205 ("An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether [his conduct] is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense.").[11]

---

[11]The fact that Michigan law prohibits self-help evictions of trespassers does not require a different result. Although state law controls on the issue of whether there is a protectable property interest, federal law governs what process is due under the Due Process Clause. *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) ("Once state law defines the substance, constitutional law establishes the minimum procedures." (citing *Cleveland Board of Education v. Loudermill*, 470

27

Thus, the Court GRANTS summary judgment on Count II of the First Amended Complaint in favor of Defendant Miller on the alternate basis of qualified immunity.

### D. Count I of the First Amended Complaint, Plaintiffs' Unconstitutional Seizure Claim, Fails as Matter of Law[12]

The Magistrate Judge concluded that Defendants were not entitled to qualified immunity on the allegation that Defendants seized Plaintiffs' property in violation of the Fourth and Fourteenth Amendments. (Dkt. 35, Report at 16.) Defendants assert that the Magistrate Judge erred in failing to consider *U.S. v. Hunyady*, 284 F. Supp. 2d 755 (E.D. Mich. 2003). (Dkt. 35, Defs.' Obj. at 7.)

Defendants are correct that in *Hunyady*, the court held that where a person is a tenant at sufferance under Michigan law, and thus in unlawful possession of a property, he has no reasonable expectation of privacy in that property under the Fourth Amendment. *Id.* at 759; *see also U.S. v.*

---

U.S. 532, 539-41 (1985))); *see also Davis v. Scherer*, 468 U.S. 183, 193-96 (1984) (holding that qualified immunity is not defeated if an official's conduct violates clearly established state law but not clearly established federal rights; "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").

[12]The Sixth Circuit has suggested that it is improper to deny a motion to amend on the grounds that the proposed claim would be subject to summary judgment. *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 421 (6th Cir. 2000) ("The test for futility . . . does not depend on whether the proposed amendment could potentially be dismissed on a motion for summary judgment; instead, a proposed amendment is futile only if it could not withstand a Rule 12(b)(6) motion to dismiss."). Thus, the Court has granted Plaintiffs' First Motion to Amend, and will exercise its discretion to *sua sponte* grant summary judgment on the Fourth Amendment claim. Plaintiffs addressed the Fourth Amendment claim in their summary judgment briefing (Dkt. 18, Pls.' Reply at 4-8), the Magistrate Judge addressed the Fourth Amendment claim in his Report (Dkt. 35 at 16), Defendants addressed the claim on its merits in their Objection (Dkt. 40), and Plaintiffs filed a substantive response (Dkt. 43). The Court finds no unfair surprise or prejudice to Plaintiffs. *See Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 931 (6th Cir. 2000) ("We have held that a district court may enter summary judgment *sua sponte* in certain limited circumstances, so long as the losing party was on notice that it had to come forward with all of its evidence." (internal quotation marks and alterations omitted)).

*Hunyady*, 409 F.3d 297, 303 (6th Cir. 2005) ("Because Hunyady's presence on the property was wrongful, and because he had a tenuous connection to an otherwise empty house, he had no legitimate expectation of privacy.").

Even though Plaintiffs were trespassers under Michigan law, *Hunyady* is not dispositive of Plaintiffs' Fourth Amendment claim.  This is because Plaintiffs do not seek to raise the Amendment's privacy shield.  Instead, Plaintiffs assert that Defendants' conduct amounts to a "meaningful interference with [their] possessory interest in [their] property," *Soldal v. Cook County*, 506 U.S. 56 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). (Dkt. 43, Pls.' Resp. to Defs.' Obj. at 4.)

In *Soldal*, the Supreme Court held that an unlawful eviction, aided by the state, constituted a seizure actionable under the Fourth Amendment.  The plaintiff in *Soldal* resided in trailer located on a mobile home park.  506 U.S. at 57-58.  The park and its owner had initiated eviction proceedings against the plaintiff, but rather than awaiting a judgment, park employees, in the presence of county sheriff deputies, "proceeded to wrench the sewer and water connections off the side of the trailer home, disconnect the phone, tear off the trailer's canopy and skirting, and hook the home to a tractor." *Id.* at 58. The Seventh Circuit dismissed the plaintiffs' Fourth Amendment claim against the county reasoning that "the Soldals' claim was more akin to a challenge against the deprivation of property without due process of law than against an unreasonable seizure," and "that they should not be allowed to bring their suit under the guise of the Fourth Amendment." *Id.* at 70.

The Supreme Court disagreed that the scope of the Fourth Amendment should be so limited. Instead, it held that "the Amendment protects property as well as privacy." *Id.* at 62.  In so holding, the Court explained that its Fourth Amendment privacy precedents, such as *Katz v. United States*,

29

389 U.S. 347 (1967), did not stand for the proposition that the "Amendment is only marginally concerned with property rights," but rather, "the message of those cases is that property rights are not the sole measure of Fourth Amendment violations." *Id.* at 64. The Court also rejected the argument that its precedents "support[] the view that the Fourth Amendment protects against unreasonable seizures of property only where privacy or liberty is also implicated." *Id.* at 65; *see also Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994) ("The Fourth Amendment protects against a seizure of property even if it occurs in a context in which privacy or liberty interests are not implicated. Thus, our finding that [the plaintiff] had no reasonable expectation of privacy in the house . . . does not affect our conclusion that [the plaintiff] has standing to challenge the seizure of her property." (citing *Soldal*, 506 U.S. at 64-65)). Accordingly, the Court agrees with Plaintiffs that *Hunyady* is not controlling.

Given that an absence of a reasonable expectation of privacy is not dispositive of Plaintiffs' Fourth Amendment claim, the Court must determine whether (1) Defendants' seizure of Plaintiffs' personal property was objectively unreasonable; and, if so, (2) whether federal law was clearly established at the time of the eviction such that it would have been plain to a reasonable officer in Defendant Miller's position that the seizure was objectively unreasonable.[13]

---

[13]*See Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987) (holding that a Fourth Amendment violation, which by definition requires unreasonable conduct, does not foreclose an additional reasonableness inquiry under a qualified immunity defense); *id.* at 659 (Stevens, J., dissenting) (asserting that majority's rule provides "two layers of insulation from liability"); *Hensley v. Gassman*, No. 09-12751, 2011 WL 124452, at *9 (E.D. Mich. Jan. 14, 2011) (Ludington, J.) ("A government official has two layers of protection under the objective reasonableness standard when applying qualified immunity to Fourth Amendment constitutional claims—one under the Fourth Amendment constitutional standard itself and another under qualified immunity defense. This can, however, lead to the awkward conclusion of a government official acting in a reasonable manner which affords him protection through the defense of qualified immunity though he acted unreasonably under the Fourth Amendment constitutional standard.").

*1. Defendants' Eviction of Plaintiffs Was Not Objectively Unreasonable*

Establishing a Fourth Amendment claim requires not only a "seizure" within the meaning of the Amendment, but an objectively unreasonable one. *See Soldal*, 506 U.S. at 71 ("'[R]easonableness is still the ultimate standard' under the Fourth Amendment, which means that numerous [eviction-type] seizures . . . will survive constitutional scrutiny." (internal citation omitted)). The reasonableness determination requires a "careful balancing of governmental and private interests." *Id.* (internal quotation marks omitted).

While it is a close case, largely for the same reasons justifying qualified immunity on Plaintiffs' Due Process Clause claim, *see* Part II.C *supra*, the Court finds that on the undisputed facts, Defendants' removal of Plaintiffs' property was not objectively unreasonable under the Fourth Amendment. *Cf. Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir. 1994) ("[T]he Fourth Amendment standard of reasonableness requires no more of government officials than that of due process of law."). As discussed, Defendant Miller had the following information when she ordered the locks to be changed on the Property: (1) the County owned the Property outright, (2) the Mills had not attempted to negotiate any agreement to remain in the Property, (3) the Mills had been told by Miller that they had to leave, (4) warning had been provided via a Notice to Quit, (5) the 30-day period in the Notice to Quit had passed, and (6) Plaintiffs had removed some of their belongings from the Property days before the Notice to Quit deadline. In addition, as discussed, the plain text of the Michigan anti-lockout statute states that it applies only to "tenants." Under these undisputed facts, a reasonable person in Miller's position could have quite rationally concluded that the Mills were trespassers under Michigan law, and that the County had the right to remove items unlawfully stored in County-owned property without additional judicial process.

31

As a point of contrast, Judge Clay's opinion in *Thomas v. Cohen*, 304 F.3d 563 (6th Cir. 2002) is helpful.[14] There, police officers evicted residents of a "'transitional shelter' for women attempting to acclimate themselves to mainstream society." *Id.* at 565. The officers asserted they were entitled to qualified immunity on the residents' Fourth Amendment unlawful seizure claim because the shelter owner had told them that the residents had not paid rent, and had physically threatened other residents. *Id.* at 567, 574. In concluding that the officer's conduct was not objectively reasonable under the Fourth Amendment, Judge Clay noted that prior to the eviction (1) "[t]he officers did not undertake any effort to determine whether Plaintiffs were indeed residents who paid rent and had a right to be on the premises;" (2) "[t]hey never asked [the shelter owner] if she had any legal authority to evict Plaintiffs and they knew that [the owner] did not have a court order"; (3) they "were informed that Plaintiffs were legal residents of the house, having keys to the premises and paying rent for their individual rooms;" (4) and "were provided with documentation establishing that Plaintiffs were tenants under Kentucky law." *Id.* at 575. As the forgoing makes plain, the facts of *Thomas* are in stark contrast to those presented here—Miller and the County were not presented with facts suggesting that the Mills had a legal "right to be on the premises" or that they were tenants under Michigan law. Rather, the undisputed facts support the opposite conclusion—that the Mills were trespassers.

Plaintiffs' reliance on *Soldal* for the proposition that Defendants' conduct was objectively unreasonable is misplaced. While *Soldal* held that a self-help eviction resulting in a seizure or

---

[14]Although Judge Clay wrote the majority opinion in *Thomas*, his Fourth Amendment analysis, Part III-B of the opinion, was not joined by the other two panel members. Judge Gilman and Judge Wallace instead found that the officers were entitled to qualified immunity on the Fourth Amendment claim.

property is a cognizable claim under the Fourth Amendment, it did not hold that the sheriff's conduct was objectively unreasonable. In fact, the Supreme Court explicitly declined to address this question:

> We fail to see how being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment. Whether the Amendment was in fact violated is, of course, a different question that requires determining if the seizure was reasonable. That inquiry entails the weighing of various factors and is not before us.

506 U.S. at 61-62.

In short, the Court finds that Defendants' removal of Plaintiffs' property was objectively reasonable under the Fourth Amendment, and, accordingly, *sua sponte* GRANTS summary judgment in favor of Defendants on Count I of the First Amended Complaint.

> 2. *Alternatively, Defendant Miller is Entitled to Qualified Immunity on Plaintiffs' Fourth Amendment Claim*

In the alternative, assuming that it was objectively unreasonable for a person in Miller's position to have removed Plaintiffs' belongings without judicial process, the Court finds that the Fourth Amendment right at issue here—that a person in unlawful possession of a property, e.g., a trespasser, is entitled to pre-eviction judicial oversight—was not clearly established at the time of eviction.

Plaintiffs rely on *Soldal*, but *Soldal* did not address the issue of whether a self-help eviction of a trespasser is a violation of the Fourth Amendment. Although *Soldal* suggests, or even holds, that it was clearly established that the Fourth Amendment protects property as well as privacy, it did not define the scope of this Fourth Amendment right to include evictions of trespassers.

33

Similarly, none of the authorities the Court has reviewed hold that the Fourth Amendment prohibits self-help eviction against a person in unlawful possession of a property. *Thomas*, 304 F.3d at 576 (Clay, J., writing separately) (finding self-help eviction of tenants—who were assumed to have a valid leasehold interest—to be a clearly established violation of the Fourth Amendment); *Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir. 1994) (holding "it was sufficiently clear at the time of the eviction that the [plaintiffs] were entitled to pre-eviction judicial oversight in the absence of emergency circumstances" where the plaintiffs were tenants of their apartment). In fact, the cases hint at the opposite conclusion. *See Thomas*, 304 F.3d at 583 (Wallace, J., concurring in part, dissenting in part) (concluding "that the officers are entitled to qualified immunity on the Fourth Amendment claim because any Fourth Amendment right not to be evicted, *if there is one*, has not been demonstrated to be a seizure *and has not yet been clearly established.*"); *cf. Revis v. Meldrum*, 489 F.3d 273, 287 (6th Cir. 2007) (finding deputy sheriff qualifiedly immune against Fourth Amendment claim where sheriff seized judgment-debtor's personal property and evicted debtor pursuant to orders in a state writ of execution but without a pre-eviction hearing or judgment of possession); *U.S. v. Hunyady*, 409 F.3d 297, 301 (6th Cir. 2005) (holding that trespassers in unlawful possession of a property have no reasonable expectation of privacy under the Fourth Amendment).

In short, because it was not clearly established that person in unlawful possession of a property is entitled to pre-eviction judicial oversight under the Fourth Amendment at the time Defendants engaged in self-help, Miller is entitled to qualified immunity on Count I of the First Amended Complaint.

34

**E. The Court Adopts the Magistrate Judge's Report as to Counts V and VI of the First Amended Complaint (Conversion and Breach of Contract)**

Defendants have moved for summary judgment on Plaintiffs' claims of conversion and breach of contract. (Dkt. 16, Defs.' Mot. at 2.) The Magistrate Judge granted Defendants' Motion on the conversion claim on the basis of governmental immunity, and on the breach of contract claim because the Notice to Quit did not create a contractual relationship between the parties. (Dkt. 35, Report at 16-18.) Although Plaintiffs have filed a Second Proposed Amended Complaint seeking to modify the conversion claim to add persons who are not entitled to state-law immunity, (Dkt. 34), they have not objected to the Magistrate Judge's recommendation on either count. Accordingly, the Court ADOPTS the Magistrate Judge's Report as to Counts V and VI of the First Amended Complaint.

**IV. CONCLUSION**

For the reasons provided, the Court GRANTS Plaintiffs' First Motion to Amend (Dkt. 19). Further, the Court ADOPTS IN PART and REJECTS IN PART the Magistrate Judge's Report (Dkt. 35). The Court ADOPTS the Magistrate Judge's Report as to Plaintiffs' conversion and breach of contract claims, and, accordingly, GRANTS summary judgment in favor of Defendants on Counts V and VI of the First Amended Complaint (Dkt. 19-1). Further, the Court GRANTS summary judgment in favor Defendants on Count I (Fourth Amendment), Count II (Fourteenth Amendment Due Process), and Count IV (Michigan's anti-lockout statute) of the First Amended Complaint. Defendants' Motion for Partial Summary Judgment (Dkt. 16) is GRANTED, and Plaintiffs' Motion for Partial Summary Judgment (Dkt. 11) is DENIED.

Counts I, II, IV, V, and VI of the First Amended Complaint are dismissed. The following

35

Counts of the First Amended Complaint remaining pending: Counts III, VII, and VIII.

**IT IS SO ORDERED.**

Date: _2 – 17 – 11_

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

36